**Mark SCHENCK, et al., Plaintiffs–Appellees,**

v.

**The CITY OF HUDSON, et al., Defendants–Appellants.**

No. 96–3881.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1997

Decided June 4, 1997.

John W. Solomon, Brouse & McDowell; Nicholas T. George, Akron, OH; Mark A. Ferguson (briefed), and Timothy J. Grendell (argued), Taft, Stettinius & Holister, Cleveland, OH, for Planitiffs–Appellees.

John E. Gotherman; Malcolm C. Douglas (briefed), Columbus, OH; Robert E. Manley, Timothy M. Burke, Manley, Burke, Lipton & Cook; Karl P. Kadon, III, City Solicitor's Office for the City of Cincinnati, Cincinnati, OH, for Amici Curiae.

Amie L. Bruggerman (argued and briefed), Charles E. Zumkehr, Roetzel & Andress,

Akron, OH, and Charles T. Reihl, Walter & Haverfield, Cleveland, OH, for Defendants–Appellants.

Before: NORRIS and MOORE, Circuit Judges; RUSSELL, District Judge.[*]

RUSSELL, D.J., delivered the opinion of the court, in which MOORE, J., joined. NORRIS, J. (pp. 595–596), delivered a separate dissenting opinion.

## OPINION

RUSSELL, District Judge.

This case involves a slow-growth zoning ordinance enacted by the defendant City of Hudson. The plaintiffs, primarily developers who already own land in Hudson, brought this action seeking a permanent injunction against the enforcement of the ordinance. After a two-day hearing, the district court granted a preliminary injunction[1] and this appeal ensued. Upon review, we find that the plaintiffs have failed to show a likelihood of success on the merits and, therefore, dissolve the preliminary injunction and remand this case for proceedings.

## I.

The City of Hudson, located in northern Ohio, is the result of a 1994 merger between the City of Hudson Village and Hudson Township. The City covers 25 square miles and has an estimated population of 21,000. Over the last thirty years the City and the Township have grown very rapidly, increasing by more than 50 percent in the 1970s and more than 35 percent in the 1980s. In a part of the state where the population has gener-

ally been declining, the area that is now the City of Hudson has had a rate of growth of 3.5 percent each year for the past 15 years.

In accordance with its conditions of merger, the City established a Comprehensive Plan (the "Plan"). The Plan, developed in conjunction with community input, public meetings, and the commission of studies on the City's infrastructure, concerns land use, recreation, community facilities, transportation, historic preservation, and growth management. Among the goals set forth in the Plan are the following: To manage the City's growth rate so that it does not exceed the capabilities of its infrastructure; To avoid the need for new infrastructure so that the City can meet current needs; and To protect the City's "unique" character. In addition, the Plan suggested that the City encourage nonresidential development to decrease the disparity between residential and nonresidential growth.

The City passed several zoning ordinances to implement the Plan's proposals, including Chapter 1207, the provision at issue in this case. In enacting these ordinances, the City relied upon studies that indicated the following: The City's sewer facilities were operating beyond capacity;[2] The City's water treatment and distribution systems are inadequate; The City's roads are insufficient for existing traffic needs; Emergency services are unable to meet the City's current needs, both in personnel and equipment;[3] and The property taxes collected from new home construction are less than the costs to the City generated by the home's construction.

Under Chapter 1207, an applicant for a zoning certificate to construct a "residential

---

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

1. The district court's preliminary injunction enjoins the City of Hudson from enforcing Chapter 1207 of its Zoning Code against any lots with final or preliminary plat approval and access to a water system, sewer or septic services, and roads. The preliminary injunction also includes lots with preliminary or final plat approval that do not yet have access to water, sewers, and roads, but the injunctive relief is deferred until such improvements become final. See Schenck v. City of Hudson Village, 937 F.Supp. 679 (N.D.Ohio 1996).

2. The City's current sewer operations exceed limits imposed by EPA regulations. In parts of what was formerly the Township there are no storm water systems. As a result, these areas have problems with flooding, which will increase with more residential development. In addition, the sanitary sewer systems are currently subject to a cease and desist order which will require the City to divert its sewage to another location. The projected cost of this measure is over nine million dollars.

3. The City estimates that it has approximately one half the number of uniformed police officers as is recommended for a city of its character.

dwelling unit" must receive a residential development allotment first. Each year the City Council determines how many residential allotments will be issued in that year, based upon the level of residential development for the previous year and the ability of the City's infrastructure to cope with new development. In July 1996, the first allotment after the ordinance's enactment, the number of allotments to be awarded for the year was set at 100 with 30 more allotments to be granted by the City Council for special projects, such as housing with 25% of the units reserved for the elderly and disabled and those with mixed commercial and residential uses that are located in the downtown area. Under the ordinance's provisions, the City can award thirty additional allotments for applicants who are denied allotments in the lottery. An unsuccessful applicant can apply for one of these allotments by showing hardship.[4] An applicant denied allotments in the lottery can also appeal to the City Council.

The allotments are distributed twice a year by a lottery system. Eighty percent of each distribution is reserved for the "priority development pool," which includes the following:

(1) Affordable housing;

(2) Housing reserved for the disabled and those over the age of sixty-two;

(3) Lots that were created and received preliminary or final plat approval before the ordinance's effective date; and

(4) Lots of five acres or more with access to a public street, public water, and sewer systems.

§ 1207.03(c)(2). All of the plaintiffs in this action qualified for the priority development pool. However, the City of Hudson has 350–375 lots that have preliminary or final plat approval and are, therefore, qualified for the priority pool. As a result, all 84 applicants in the July 1996 distribution were priority applicants, and the distribution was determined by a lottery, in which no applicant received more than one allotment. After the July

1996 distribution the plaintiffs filed this action.

## II.

We review the district court's grant of a preliminary injunction for abuse of discretion. *First Technology Safety v. Depinet,* 11 F.3d 641, 647 (6th Cir.1993). A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact. *Id.; Lorain NAACP v. Lorain Board of Educ.,* 979 F.2d 1141, 1147–48 (6th Cir.1992), *cert. denied,* 509 U.S. 905, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993); *United States v. School Dist. of Ferndale,* 577 F.2d 1339, 1351 (6th Cir.1978).

The reviewing court should consider four factors when determining whether the district court's grant of a preliminary injunction was an abuse of discretion: (1) the likelihood of success on the merits of the action; (2) the irreparable harm which could result without the relief requested; (3) the impact on the public interest; and (4) the possibility of substantial harm to others. *L.P. Acquisition Co. v. Tyson,* 772 F.2d 201, 205 (6th Cir.1985).

"To show a likelihood of prevailing on the merits, the [party seeking the injunction] must show the likely existence of a constitutional violation causally related to the result sought to be enjoined." *Id.* (quoting *Martin–Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 565 (6th Cir.1982)). In reviewing a zoning ordinance, a federal court may only consider "whether the legislative action is rationally related to legitimate state land use concerns." *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1223 (6th Cir.1992). Therefore, to prevail in this action, the plaintiffs must show that the zoning provision is not rationally related to a legitimate land use concern.

"The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential

---

4. "Hardship" allotments are distributed by the City for applicants who show that "the property in question will not yield a reasonable return or there is not any beneficial use of the property without an allotment." § 1207.11(m). Any hardship allotment "shall be deducted from the available annual allocation for that allocation year or subsequent years." § 1207.08(b)(4)(a).

aspect of achieving a satisfactory quality of life...." *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981); *Pearson,* 961 F.2d at 1223. A legislative body need not even select the best or the least restrictive method of attaining its goals so long as the means selected are rationally related to those goals. *See National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1129 (7th Cir.) ("If there are alternative ways of solving a problem, [the federal courts] do not sit to determine which of them is best suited to achieve a valid state objective."), *cert. denied,* —— U.S. ——, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). Likewise, despite the temptation it is not the province of a federal court to act as a super-zoning board. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) ("[T]he Due Process Clause does not empower the judiciary 'to sit as a superlegislature to weigh the wisdom of legislation.'" (quoting *Ferguson v. Skrupa,* 372 U.S. 726, 731, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963))).

■ It is clear that the City of Hudson had a proper purpose, land use. As noted above, Chapter 1207 of the City's zoning code has several stated land use goals,[5] which are based on enumerated findings of fact. *See* §§ 1207.01, 1207.02. The Supreme Court has specifically recognized similar goals as legitimate state interests. *See, e.g., Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (holding goals of reducing traffic, noise and parking problems legitimate state interests); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 393–94, 47 S.Ct. 114, 120–21, 71 L.Ed. 303 (1926) (holding desire to decrease traffic congestion, increase safety and security, and economic administration legitimate purposes); *Construction Indus. Ass'n v. City of Petaluma,* 522 F.2d 897, 909 (9th Cir.1975) (holding desire to preserve small town character, open spaces, and low density and to grow at "an orderly and deliberate pace" legitimate governmental interests), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). Therefore, to survive a substantive due process challenge, Chapter 1207 must merely be rationally related to its purpose.

■ We conclude that it is. "Federal court review of a zoning ordinance may only determine whether it is clearly arbitrary and unreasonable, in the very restricted sense that it 'has no substantial relation to the public health, safety, morals or general welfare.'" *Pearson,* 961 F.2d at 1223 (quoting *Village of Belle Terre v. Boraas,* 416 U.S. 1, 7–8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974)). The City of Hudson wishes to control growth of residential areas until such time as its infrastructure is able to meet current and future needs. A cap on the number of homes built in the City unquestionably bears a rational relationship to this concern.

Even though the City of Hudson will have to remedy existing infrastructure problems regardless of whether another house is built,

---

**5.** The purpose and intent of this ordinance is to:

 (a) [E]stablish a Growth Management Development Allocation System in the City of Hudson to regulate the rate at which the city issues zoning certificates for certain residential dwelling units and subdivisions;

 (b) Implement the policies and goals of the 1995 City of Hudson Comprehensive Plan (1995 Comprehensive Plan) relating to growth management and strategy, transportation, community facilities and infrastructure, economic development, and community character.

 (c) [E]stablish a residential development management and allocation system to control the rate of residential development to ensure that:

 (1) Growth is orderly and that municipal infrastructure and public services are available concurrently with such development and to prevent further deterioration of public facility and infrastructure service levels;

 (2) The fiscal impact of such development does not exceed revenue available from such development and other sources to pay the cost of infrastructure and services which it necessitates;

 (3) The community character of the city as a desirable place to live and conduct business is not eroded and that property values are protected throughout the city;

 (4) The density of population in the city is managed carefully to prevent overcrowding and congestion; and

 (5) Existing developments are completed and land adjacent to existing subdivisions is developed on a preferential basis to reduce infrastructure extension costs.

Growth Management Residential Development Allocation System, § 1207.01.

Chapter 1207 is rationally related to the City's legitimate concerns. Slowing the rate of growth will allow the City to improve its infrastructure to meet existing and future needs without straining resources. At the same time the City's system is designed to accommodate its changing needs. For example, the number of allotments available is reviewed annually by the City Council to ensure that growth occurs in tandem with infrastructure improvements. In addition, landowners who had obtained preliminary or final platting approval when the ordinance was enacted are granted "priority" status when allotments are assigned.

In the event that there are more applicants than allotments in a given year, the lottery system is certainly a rational means of distribution because it avoids beauty contests between property owners and is more efficient for the City to administer. A system which weighs the merits of each development in determining the distribution of allotments would be more cumbersome and could exclude developments for subjective reasons. The City's lottery system promotes efficiency and allows every applicant an equal chance at obtaining one of the allotments. Finally, the ordinance contains a provision for landowners who have not received an allotment after one year to petition the City Council for compensation due to hardship.

## III.

 Chapter 1207 clearly has a substantial relationship to the City's welfare because it will slow the City's growth until such time as the City believes it is equipped to sustain a more rapid growth rate. It is not our place to judge the wisdom of such a provision because "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979). As such, the district court abused its discretion by granting plaintiffs' request for a preliminary injunction.

The preliminary injunction is DISSOLVED and this case is REMANDED for proceedings on the merits.

ALAN E. NORRIS, Circuit Judge, dissenting.

Although one might posit a slow-growth ordinance which is sufficiently narrow and prospective to meet the test of rationality, we are not favored with such an ordinance in this appeal.

Plaintiffs are not individuals who contemplate purchasing lots in Hudson with full knowledge of the restrictions imposed by the slow-growth ordinance at issue in this case. Rather, they are, for the most part, individuals and business entities which have already invested substantial time and money in improving lots for development. Furthermore, they made these investments in good faith reliance upon platting approval received from the appropriate governmental bodies.

The majority's analysis fails to distinguish between the legitimate expectations of these property owners, and those of future developers of lots located in Hudson. The district court recognized that the two groups are not similarly situated, declining to enjoin the prospective application of Chapter 1207. Instead, it limited the scope of the injunction to those lots which had obtained preliminary or final plat approval, and which enjoyed access to existing infrastructure.[1] In my view, the distinction drawn by the district court is proper: forcing the owners of the lots covered by the injunction to comply with the scheme set forth by Chapter 1207 is not rationally related to the stated purpose of the slow-growth ordinance.

First, the primary rationale advanced by the City in defense of this ordinance concerns the rate at which new building threatens to outpace existing infrastructure. Given this concern, one would expect that exceptions to the allotment scheme would be made

---

**1.** The district court also enjoined enforcement of Chapter 1207 with respect to lots which have preliminary or final plat approval but are not currently improved; it did, however, delay the availability of injunctive relief until those lots "are fully improved with such infrastructure."

for approved lots with existing water, sewer, and road access. This is not the case. Although such lots are accorded "priority" status, that designation is effectively meaningless because every allotment granted during the period under review went to a "priority" applicant. Second, limiting owners of multiple improved lots to the same, single allotment as owners of one lot strikes me as irrational on its face, particularly where, as here, owners of multiple lots have invested significant sums in infrastructure, the very problem Chapter 1207 purports to address.

In short, although deferential, our review of zoning ordinances such as that enacted by Hudson does not end once the city articulates a legitimate land use concern. Rather, we must make sure that the ordinance is rationally related to the alleviation of that concern. When its practical effect is to impose harm on a class of property owners which is clearly arbitrary and unreasonable, the ordinance runs afoul of substantive due process. *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1223 (6th Cir.1992). Because that is the case here, I believe the district court properly granted injunctive relief to those individuals who own lots that have received either preliminary or final plat approval.

Accordingly, I respectfully dissent.

