**ALLIED SYSTEMS LTD., a Georgia Limited Partnership, Plaintiff–Appellant,**

v.

**TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTERS INDUSTRY NEGOTIATING COMMITTEE, LOCAL UNION 327, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Dave Hodgin and Jimmy Neal, its officers, agents and**
**employees and its members who are employed by Plaintiff Allied Systems, Ltd. at its Nashville, Tennessee facilities, Defendants–Appellees.**

No. 98–5862.

United States Court of Appeals, Sixth Circuit.

Argued March 10, 1999.

Decided and Filed June 9, 1999.

Roberto L. Mercado (briefed), R. Ian Hunter (argued and briefed), Dean & Fulkerson, Troy, MI, Rowan H. Leathers, III, Manier & Herod, Nashville, TN, for Plaintiff–Appellant.

Michael J. Passino (argued and briefed), Lassiter, Tidwell & Hildebrand, Nashville, Tennessee, for Teamsters National Automobile Transporters Industry Negotiating Committee, Dave Hodgin and Jimmy Neal.

Michael Hamilton (briefed), Provast & Umphrey, for Local 327.

Before: JONES, SUHRHEINRICH, and MOORE, Circuit Judges.

## OPINION

JONES, Circuit Judge.

Plaintiff–Appellant Allied Systems, Ltd. ("Allied") appeals the district court's denial of a preliminary injunction preventing defendants-appellees Teamsters National Au-

tomobile Transporters Industry Negotiating Committee, Local 327 (the "union")[1] from engaging in a strike at Allied's terminal facility. Because we agree that the district court's denial of the injunction was proper, we affirm.

## I.

The facts underlying this appeal are not in dispute. Allied is in the business of transporting automobiles in the United States and Canada from various rail, plant, and port locations to dealerships. It operates over 100 shipping facilities throughout the country, including one at 743 Harding Street in Nashville, Tennessee ("Harding Facility"). Allied also recognizes and has a collective bargaining relationship with the union, which, in turn, represents the workers at Allied's facilities.

For each Allied shipping terminal location, including the Harding Facility, labor relations were governed by a multi-employer, multi-local union collective bargaining agreement known as the National Master Automobile Transporters Agreement ("National Agreement"). Among many other things, the National Agreement contains an "established wage rate" for each facility, which was negotiated at both the national and local levels and approved by the union. Once negotiated and approved, the established wage rate remains effective for the term of the National Agreement. In addition, the National Agreement contains several provisions to the effect that any disputes over the interpretation of the National Agreement are to be submitted to an arbitrator. For example, Article 7, Section 7(a) of the National Agreement provides:

It shall be the function of the National Joint Arbitration Committee to settle disputes and grievances which arise under the following circumstances:

(1) Involving interpretations of, or disputes over, the provisions of the [National Agreement].

. . .

(4) Disputes and interpretations concerning alleged conflicts in provisions of the [National Agreement] on the one hand and Area Supplements and Riders thereto on the other hand.

J.A. at 144–45.

Pertinent to this appeal, the National Agreement contains a no-strike provision and a comprehensive grievance and arbitration procedure to which disputes arising under the National Agreement are to be submitted. Specifically, Article 7, Section 1 of the National Agreement provides in relevant portions as follows:

The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination.

The Unions and Employers agree that there shall be no strike . . . without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise.

J.A. at 139. However, there is an "exception" to the no-strike clause, which reads in relevant part as follows:

Any disputes the parties are unable to settle shall be referred to the appropriate Automobile Transporters Joint Area Arbitration Committee, except for the following direct violations, which are nondisputable:

(a) *Nonpayment of the established wage rates,* when due, provided for in this Agreement, Supplements or Riders;

. . .

1. The workers comprising Local 327 delegated their bargaining authority to appellee Teamsters National Automobile Transporters Industry Negotiating Committee, which is a union negotiating committee established pursuant to the International Brotherhood of Teamsters' Constitution. For simplicity's sake, we will refer to both collectively as the "union."

(e) This paragraph does *not* apply to *disputes over the computation of wages or application of wage rates.*

The Local Union shall give the Employer a seventy-two (72) hour written notice ... prior to taking any strike action authorized by the Section.

*Id.* (emphasis added). Interpretation of these subsections is the crux of the dispute in this appeal.

On October 1, 1997, Allied purchased Ryder Automobile Carrier Group and its subsidiary corporations including Commercial Carriers, Inc. With the purchase, Allied acquired several additional shipping facilities, including one located at 600 Veritas Street in Nashville ("Veritas Facility"). Allied reports that after the purchase, it possessed several "dual" and redundant shipping terminals in many cities, including Nashville. Allied management decided it would be economically efficient to consolidate several, if not all, of the dual terminals in most cities. This decision directly affected the operations at the Harding and Veritas Facilities in Nashville. In November 1997, Allied announced its intention to merge the two Nashville facilities sometime in early 1998.

The parties agree that because the Harding and Veritas facilities were operated by two different companies prior to October 1997, there were a number of differences in the terms and conditions of employment at the facilities. One such difference was the facilities' established pay rate for labor. Although the parties resolved many other differences concerning the consolidation of the facilities (such as seniority determinations) through dispute resolution, Allied refused to negotiate the issue of the two different established pay rates. Instead, according to Allied, prior arbitration decisions in the industry established that when two terminals were merged, the conditions that applied at the terminal into which the operations were physically merged were the conditions that continued and applied at the surviving terminal. After Allied decided to merge the Harding and Veritas operations into the physical Harding Facility, it therefore determined that the Harding established pay rate would govern all workers at the "new" merged facility.

Allied acknowledges that the wage rates at the Harding and former Veritas Facilities were "dissimilar," but contends that the net effect of the Harding wage rate was still higher than the Veritas Facility. Nevertheless, the union was displeased by Allied's decision to discontinue paying the established wage rate from the Veritas Facility. Pursuant to the National Agreement, the union issued a 72–hour strike notice on May 29, 1998. On June 4, 1998, picketers appeared at the Harding Facility with signs reading (among other things) "Failure of Allied Systems to Pay Established Wage Rates."

Later that day, Allied filed a complaint in the district court under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and a motion for a temporary restraining order enjoining the Union from striking at the Harding Facility. Following a hearing that afternoon, the district court granted the motion for a TRO and issued an order to show cause why a preliminary injunction should not be issued against the union for violating the no-strike clause of the National Agreement.

On June 11, 1998, the district court held a hearing on the motion for the preliminary injunction under § 301. In a ruling issued from the bench, the district court denied Allied's request for a preliminary injunction.

This timely appeal followed.

## II.

This court will review a district court's grant or denial of a preliminary injunction for an abuse of discretion. *Schenck v. City of Hudson,* 114 F.3d 590, 593 (6th Cir.1997). An abuse of discretion exists when the district court "applies the

incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Id.* This court will also review the district court's findings of fact for clear error, and its conclusions of law *de novo. Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir.1996). Finally, this court will conduct a *de novo* review of the district court's interpretation of a collective bargaining agreement. *Salary Policy Employee Panel v. Tennessee Valley Auth.,* 149 F.3d 485, 489 (6th Cir.1998).

### III.

### A.

█ A district court has the authority under § 301 to compel specific performance of a collective bargaining agreement requiring the arbitration of grievances in a labor dispute. *See* 29 U.S.C. § 185(a). However, § 4 of the Norris–LaGuardia Act, 29 U.S.C. § 104, significantly curtails a district court's ability to issue an injunction against labor strikes and work stoppages. The pertinent portion of the Act reads:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from . . .
>
> > (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence[.]

29 U.S.C. § 104. This court has recognized that the "anti-injunction provisions of the Norris–LaGuardia Act were intended to protect workers in the exercise of organized economic power." *Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs., Inc.),* 713 F.2d 211, 216 (6th Cir.1983) (per curiam). As the Supreme Court stated: "Congress acted to prevent injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital." *Brotherhood of R.R. Trainmen v. Chicago River,* 353 U.S. 30, 39, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).

█ Occasionally, § 301 of the LMRA and § 4 of the Norris–LaGuardia Act come to direct loggerheads when a district court is asked to enjoin a labor strike which the employer contends violates a collective bargaining agreement. The Supreme Court first addressed the inherent conflict between the two statutes in *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In *Boys Markets,* the Court reasoned that "a no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration." *Id.* at 248, 90 S.Ct. 1583. The Court further opined that "[a]ny incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated." *Id.* Accordingly, the Court reconciled § 301 of the LMRA and the anti-injunction provisions of the Norris–LaGuardia Act by creating a "narrow" exception to the Norris–LaGuardia Act: federal courts are permitted to enjoin strikes only when such action would enforce terms of a collective bargaining agreement specifically negotiated by the parties. *See id.* at 253–54, 90 S.Ct. 1583.

In this appeal, Allied maintains that the decision to utilize the wage rates from the former Harding Facility to the new "merged" facility was a "dispute[ ] over the computation of wages [and/or] application of wage rates" within the meaning of Article 7, Section 1(e) of the no-strike clause in the National Agreement. Thus, in Allied's view, the union was precluded from striking under the terms of the National Agreement, and the district court should have issued the injunction. In the alternative, Allied contends that all disputes over interpretation of the National Agreement were themselves to be arbitrated pursuant

to Article 7, Section 7(a). The union responds, and the district court agreed, that the strike fell within the exception of Article 7, Section 1(a) of the no-strike provisions, as the strike was "over what can be characterized as the abandonment or unilateral repudiation and nonpayment of previously negotiated established wage rates for the Veritas facility." J.A. at 117 (Bench Ruling).

■ When seeking a *Boys Markets* injunction, the employer has the burden of showing that it is entitled to such an injunction. *In re Crowe & Assocs., Inc.*, 713 F.2d at 215; *Plain Dealer Publ'g Co. v. Cleveland Typographical. Union No. 53*, 520 F.2d 1220, 1227–28 (6th Cir.1975); *Parade Publications, Inc. v. Philadelphia Mailers Union No. 14,* ·459 F.2d 369, 373 (3d Cir.1972). This court has articulated the analysis to be followed when determining whether a party is entitled to an injunction against a labor strike or work stoppage within the meaning of *Boys Markets:*

> First, the controversy must involve or grow out of a labor dispute within the meaning of Section 4 of the [Norris–LaGuardia] Act. Second, a full evidentiary hearing must be held. Third, the court must find that the dispute underlying the controversy is subject to binding arbitration under the terms of the collective bargaining agreement. Finally, the traditional equitable bases for injunctive relief must be met. A court has jurisdiction to issue an injunction only where all four of the above steps have been completed and satisfied.

*International Union United Auto. Workers v. Lester Eng'g Co.*, 718 F.2d 818, 822 (6th Cir.1983). The parties agree that only the third factor is of relevance in this appeal.

■ Although the parties creatively articulate several issues for us to consider, the essence of their legal dispute can be distilled to one simple question: was the district court correct in denying Allied's request for an injunction? We agree that

the district court did not abuse its discretion below.

**B.**

Allied first argues that the district court should have issued the injunction because of a strong congressional policy favoring arbitration of labor disputes, and because Article 7, Section 7(a) of the National Agreement mandates that disputes over conflicting provisions are themselves to be resolved through arbitration. Since *Boys Markets*, the Supreme Court has emphasized that the anti-injunction provisions of the Norris–LaGuardia Act are to be given a "broad interpretation" and that the *Boys Markets* exception is to be recognized "only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy." *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 708, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). Allied is correct that congressional policy has long favored the arbitration of labor disputes. *See generally Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1363, 4 L.Ed.2d 1432 (1960). However, it must be remembered that a congressional policy favoring arbitration "does not reflect a congressional policy favoring the issuance of anti-strike injunctions pending arbitration." *Waller Bros. Stone Co. v. United Steelworkers*, 620 F.2d 132, 135 (6th Cir.1980). As a corollary point, it is obvious that no congressional policy is furthered by forcing a party to a collective bargaining agreement to arbitrate issues for which it explicitly retained the right to utilize economic weapons in labor negotiations.

Similarly, Allied's argument that it is entitled to an injunction on the basis that Article 7, Section 7(a) calls for arbitration of all disputes over interpretation of the National Agreement's provisions is also unavailing. The Supreme Court has made clear that the mere arbitrability of the issue of whether a strike violates a no-strike provision does not entitle the employer to a *Boys Markets* injunction. *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 409–10, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). We expounded the point in *Waller Brothers:* "the fact that a strike may arguably violate the provisions of the collective bargaining agreement, and may thus present an arbitrable issue does not justify the issuance of a *Boys Markets* injunction." *Waller Bros.*, 620 F.2d at 136; *see also Complete Auto Transit, Inc. v. Reis*, 614 F.2d 1110, 1113 (6th Cir.1980), *aff'd* 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981).

Most collective bargaining agreements contain arbitration clauses. *Truck Drivers Local 705 v. Schneider Tank Lines Inc.*, 958 F.2d 171, 174 (7th Cir.1992). That a collective bargaining agreement calls for arbitration over disputes regarding construction of the agreement is hardly unusual. *See, e.g., National Wrecking Co. v. Kumerow*, 606 F.Supp. 374, 375 (N.D.Ill. 1985) (denying injunction even though agreement provided "for binding arbitration of disputes and grievances with respect to the application and construction of the agreement"); *National Mine Serv. Co. v. United Steelworkers.*, 385 F.Supp. 856, 859 (N.D.W.Va.1974) (denying injunction despite broad scope of grievance procedure). In the case *sub judice*, the underlying dispute is whether Allied's decision to use the Harding Facility wage rates constituted the non-payment of the Veritas rates, or was an exercise in the application of wage rates. But as far as a *Boys Markets* injunction is concerned, only resolution of *this* dispute is relevant to our inquiry.

It can be argued that whether Article 7, Section 7(a) comes into effect is a natural and logical extension of the parties' underlying dispute in this case. However, we believe it unwise to tread beyond the core underlying dispute between the parties, as such determinations "would embroil the courts in endless circular reasoning trying to decide where arbitrability starts and where it stops." Comment, *Labor Injunctions Pending Arbitration: A Proposal to Amend Norris–LaGuardia*, 63 Tul. L. Rev. 1681, 1694 n. 85 (1989). Additionally, the Supreme Court's decision in *Jacksonville Bulk Terminals* supports the view that a federal court must constrain itself solely to the arbitrability of the underlying dispute in determining whether to issue a *Boys Markets* injunction. In that case, the workers refused to handle any cargo bound to or coming from the former Soviet Union in protest of the 1979 invasion of Afghanistan. The·Court held that the underlying dispute between the parties was a political dispute "plainly not arbitrable under the collective bargaining agreement." *Jacksonville Bulk Terminals*, 457 U.S. at 721, 102 S.Ct. 2672. The Court reached this conclusion despite the fact that the collective bargaining agreement in that case contained "both a broad no-strike clause and a provision requiring the resolution of *all* disputes through a grievance procedure, ending in arbitration." *Id.* at 706, 102 S.Ct. 2672 (emphasis added). If the collective bargaining agreement in *Jacksonville Bulk Terminals* was insufficient to entitle the employer to a *Boys Markets* injunction, then the same must be said for Article 7, Section 7(a) in this case.

### C.

Allied's remaining argument is that it was entitled to a *Boys Markets* injunction because, in its view, the underlying dispute was over an arbitrable issue-namely, the computation and/or application of wage rates. We have previously held that *Boys Markets* injunctions are to be granted only when "it clearly appears to the trial judge that the dispute which underlies the strike is subject to a no-strike obligation." *Waller Bros.*, 620 F.2d at 137; *accord Matson Plastering Co., Inc. v. Operative Plasterers & Cement Masons Int'l Ass'n, Etc.*, 633

F.2d 1307, 1308 (9th Cir.1980) (*Boys Market* injunction proper only when a "clear" and "undisputed" contractual duty to arbitrate the underlying dispute exists).

We are not convinced that Allied has met its burden of showing that the dispute was clearly and undisputably over an arbitrable issue. The parties agree that several necessary changes were effectuated as a result of the merging of the two Nashville facilities including dispatch procedures and payroll policies. Likewise, it is also agreed that the parties submitted grievances to resolve seniority disputes to an arbitration panel. However, there is no evidence that the union engaged in a work stoppage for reasons other than the wage rate controversy. Such should not be surprising, because the no-strike exceptions of Article 7, Section 1 only reserved the right to strike in limited situations, including the nonpayment of established wage rates.

 At the very least, reasonable minds may differ as to whether Allied's decision to use the Harding Facility wage rate constituted (as the union asserts) the nonpayment of the Veritas Facility established wage rate, or (as Allied asserts) the application of wage rates. Both the union's and Allied's interpretation of the National Agreement have merit. However, so long as the right to strike is interrelated with an ambiguity in a collective bargaining agreement, a federal court is without jurisdiction to issue a *Boys Market* injunction. As the Second Circuit has succinctly pronounced:

> Where the collective agreement, as here, excepts from the requirement of arbitration certain types of contract violations and provides that the union retains the right to strike with respect to such violations, no injunction can issue against a strike where the union presents a colorable claim·that such violations have occurred.

*Standard Food Prods. Corp. v. Brandenburg*, 436 F.2d 964, 966 (2d Cir.1970). We find this reasoning particularly fitting in the case *sub judice*, because we believe that the union has made a colorable claim that the strike was not over an arbitrable issue.

Our decision in *Waller Brothers* presented a similar scenario involving differing meritorious interpretations of a collective bargaining agreement. In that case, the bargaining agreement contained a dispute resolution procedure for all disputes, but provided that wage rates were not subject to arbitration, and that the union reserved the right to strike in the event of a disagreement on wages. *Waller Bros.*, 620 F.2d at 134. In addition, the bargaining agreement also provided a schedule of wage rates for different job classifications. *Id.* The strike began when the employer purchased new packing equipment and the union believed that it was entitled to negotiate a new wage rate for the operator of the packing equipment. *Id.* at 133. The employer argued that the new packing machine operating-position was essentially a revised version of an old job that had been listed on the wage rate schedule. *Id.*

We vacated the district court's issuance of a *Boys Market* injunction because the employer had not clearly demonstrated that its interpretation of the contract was correct. While acknowledging that the employer's position had "some force," we noted that the parties' "underlying dispute [was] inescapably over wage rates." *Id.* at 137. Because the union had reserved the right to strike over wage rates disputes, and because the resolution of the question of whether the strike was in fact in violation of the no-strike clause could not be "fully addressed in an action seeking a preliminary injunction," we concluded that the district court's issuance of the injunction was improper.[2] *Id.* at 136–37.

---

2. Allied argues that *Waller Brothers* is distinguishable from the present case because the National Agreement contained a more comprehensive grievance resolution procedure calling for arbitration of disagreements over the construction of the National Agreement's provisions per Article 7, Section 7(a). For the reasons explained in section III(B) of this opinion, Allied's continued reliance on Article 7, Section 7(a) is misguided.

The Ninth Circuit's decision in *Matson* is also illustrative of the high burden an employer faces when seeking a *Boys Market* injunction. In that case, the union engaged in a work stoppage over the employer's failure to pay an assessment for late payment of contributions to the union's trust fund. *Matson*, 633 F.2d at 1309. It was undisputed that the collective bargaining agreement permitted a strike for failure to make the contribution payments themselves. *Id.* The employer presented various arguments why the agreement did not allow a strike—presumably because the union only retained the right to strike for failure to pay the contributions, not failure to pay the assessments. *Id.* The Ninth Circuit vacated the district court's injunction for essentially the same reason as *Waller Brothers*-absent a showing that the union's actions clearly offended its no-strike obligations under the collective bargaining agreement, a "district court has no jurisdiction to enjoin strike activity[.]" *Id.*

As was the situation in *Waller Brothers* and *Matson*, the interpretation of the National Agreement with regards to the propriety of the union's strike in this case is "far from clear." Contrary to Allied's protestations, however, our affirming the district court's judgment is hardly a resolution of the merits of the underlying dispute. We do not hold that the union indeed had the right to strike over Allied's decision to forgo the wage rates used at the former Veritas Facility in favor of the Harding Facility rates. We hold only that Allied has not demonstrated that its interpretation of the National Agreement is so clearly and undisputably correct to warrant the issuance of a *Boys Market* injunction. Accordingly, the district court did not abuse its discretion in denying Allied's request for a preliminary injunction. If Allied wishes to seek recourse against the union, it must do so in an unfair labor practice action on the merits.

## IV.

For the reasons stated herein, the district court's denial of Allied's request for injunctive relief is **AFFIRMED**.